# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JULIAN JESUS REYNOSO and JOHN PAUL REYNOSO

Petitioners,

v.

JAMES E. HALL, and G.J. GIURBINO, WARDENS

Respondents.

_______________________________________/

1:04-CV-5025 LJO DLB HC

FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS

[Doc. 1]

Petitioners are state prisoners proceeding in a habeas corpus action pursuant to28 U.S.C. § 2254. Petitioners are represented by Federal Defender, David M. Porter.

BACKGROUND

Following a joint jury trial, in the Tulare County Superior Court, Petitioners were convicted of first degree murder (Cal. Pen. Code § 187(a)),[1] and other related offenses.

Petitioners filed a timely notice of appeal. In November 2001, the Court of Appeal for the Fifth Appellate District reversed the judgment for Batson[2] error. (Lodged Doc. 3.)

On January 3, 2002, the People filed a petition for review in the California Supreme Court. (Lodged Doc. 4.) On February 20, 2002, the California Supreme Court granted review. (Lodged Doc. 5.)

On August 25, 2003, after briefing by the parties, the California Supreme Court reversed

---

[1] All further statutory references are to the California Penal Code, unless otherwise indicated.

[2] Batson v. Kentucky, 476 U.S. 79 (1986).

the appellate court's opinion and remanded the case. (Lodged Doc. 10.) On March 29, 2004, the remittitur issued affirming the judgment.

On December 19, 2003, Petitioner, Julian Jesus Reynoso, filed the instant petition for writ of habeas corpus in the United States District Court for the Eastern District of California, Sacramento Division. By order of January 8, 2004, the action was transferred to the Fresno Division.[3] (Court Doc. 3.)

Petitioner, John Paul Reynoso, filed a petition for certiorari in the United States Supreme Court, which was denied, 545 U.S. 1127 (2005). On June 12, 2006, John Paul, filed a petition for writ of habeas corpus in this Court, in case number CV-F-06-00757 OWW TAG HC.

By order of February 13, 2004, the Court directed Respondent to submit a response to the petition, in Julian Jesus's case. (Court Doc. 5.)

On August 4, 2005, Respondent filed an answer to the petition for writ of habeas corpus.[4] (Court Doc. 22.) Petitioner, Julian Jesus Reynoso, did not file a traverse.

On September 27, 2006, the Court directed Respondent to submit supplemental briefing in light of recent case authority. The Court also appointed the Office of the Federal Defender to represent Petitioner, Julian Jesus Reynoso.

On November 13, 2006, the Court consolidated the instant case with John Paul Reynoso v. G.J. Giurbino, 06-CV-00757 OWW TAG HC, and counsel was appointed to represent both Petitioners.

On January 2, 2007, Respondents filed a supplemental brief. Petitioners filed their supplemental brief on April 16, 2007.

STATEMENT OF FACTS[5]

---

[3] The proceedings on this petition were stayed pending the Supreme Court's ruling on John Paul's certiorari petition.

[4] On August 16, 2005, the Court granted Respondent's request for a protective order and directed the transcript of the jury selection be filed under seal. (Court Doc. 26.)

[5] The following summary of facts are taken from the opinion of the California Supreme Court, Lodged Document No. 10. The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

John Reynoso and his brother Julian were at a residence with several others, including the murder victim, Mario Martinez. John Reynoso and Martinez got into an argument, which culminated in Reynoso fatally shooting Martinez in the chest at point-blank range with a shotgun. Reynoso admitted shooting Martinez, but claimed he did so because he was in fear of his brother Julian's life. Julian's defense was that he did not aid or abet his brother and had no prior knowledge that John was going to shoot Martinez. Julian himself was armed with a handgun and threatened one of those present with it as the brothers fled. Both defendants were convicted of first degree murder. John Reynoso was found to have used a firearm and inflicted great bodily injury during the commission of the murder within the meaning of Penal Code section 12022.53, subdivision (d). Julian Reynoso was also convicted of assault with a firearm, knowingly and maliciously dissuading a witness, and being an accessory after the fact.

Jury Selection

The facts relevant to the Batson/Wheeler claim are as follows. Jury selection lasted less than one day. At the start of voir dire, the trial court excused a total of 53 prospective jurors on the basis of claims of hardship, without objection from the defense. More than one-quarter of those excused for claimed hardship (at least 14 prospective jurors, and perhaps as many as 17) were of Hispanic ancestry. The People exercised a total of four peremptory challenges, the last two of which were to Hispanic Prospective Jurors Mary L. And Elizabeth G. Defendants are Hispanic. So, too, was the murder victim. The final jury sworn to hear defendants' case contained no Hispanic jurors.

The trial court conducted the voir dire and initially asked each prospective juror to answer nine questions posted on a board in the courtroom, which asked for his or her name, general address, occupation and length of occupation, spouse's occupation and length of occupation, marital status, prior jury service, if any (type of case, how long ago, whether a verdict was reached), past involvement in a criminal case (as a charged suspect, victim, or witness to a crime), legal or medical training, if any, past involvement in law enforcement, if applicable, and whether they had any close friends or relatives in law enforcement.

Mary L. gave the following response to the court's general inquiry: 'My name's [Mary L.]. I live in Earliment, California. I've lived there most of my life. I'm a case manager for at-risk youth. My husband is a foreman for farm labor. I've never been selected for jury. I've never been involved in a criminal case or victim. I have no legal or medical training. Never been involved in law enforcement. And I do have relatives that are in law enforcement.'

Mary L. was thereafter excused as a result of the prosecutor's exercise of his third peremptory challenge, after he had passed and accepted the jury four times while she was seated in the jury box.

Elizabeth G. gave the following response to the court's general inquiry: "My name is [Elizabeth G.]. I just moved to Porterville for four months. My occupation I'm a customer service rep. I've been there for eight and a half years. My spouse, he's a construction supervisor. And he's been that for over 18 years. I've never served on a jury before. I've never been involved in any criminal [sic] or been a victim. I don't have any legal or medical training. Never been involved in any law enforcement. As far as a friend, I have a friend who's an officer in Porterville. As far as the relative, he's a brother who is a correctional officer."

Elizabeth G. was thereafter excused as a result of the prosecutor's exercise of his fourth and final peremptory challenge, after he had passed and accepted the jury 14 times while she was seated in the jury box.

After the jury selection was completed but before the jury and alternatives were sworn, defendant Julian Reynoso made a *Batson/Wheeler* motion arguing that the peremptory challenges to Mary L. and Elizabeth G. were made solely out of group bias, i.e., on racial grounds, in violation of his constitutional rights,

rather than for proper reasons specific to the challenged prospective jurors . . . . ¶

Counsel articulated the basis for his motion as follows: 'The [prosecutor] kept passing and passing and saying that they were happy with the jury, happy with the jury. [¶] Of the only juror they excused initially was the one gentleman who knew me from [a local tennis club], and then after that the only two other jurors that were dismissed [by the prosecutor] were Hispanics, [Elizabeth G.] and [Mary L.] [¶] I would take note of the fact that the jury as it's constituted now has twelve Whites as the twelve jurors and three White alternates. I think it was a deliberate attempt by the prosecution to eliminate the two Hispanics that made it to the jury panel [*sic*: box] from the jury panel. The two defendants in this case are both Hispanic. I believe that that's a violation of Wheeler, your Honor.' Codefendant John Reynoso joined in the motion.

The trial court indicated that 'because the People did only exercise . . . four [peremptory] challenges and two of those were Hispanic, I'm going to ask that the People give their reasons why they excused those two.' The prosecutor sought clarification as to whether the court was ruling that a prima facie case (of systematic exclusion for group bias) had been shown. The court replied, 'Yes.' The prosecutor proceeded to give his reasons for excusing Mary L. and Elizabeth G.

The prosecutor's reasons for exercising his third peremptory challenge to excuse Prospective Juror Mary L., were these: 'Your Honor, the People dismissed [Mary L.] based upon her being a counselor for at-risk youth. The People feel that [Mary L.] would have an undue sympathy for both defendants in this case because they are young and definitely if not at risk, past risk. [¶] The People feel that she would associate with the people she works with and she would probably would [sic] have pity on them.'

The prosecutor's reasons for exercising his fourth peremptory challenge to excuse Prospective Juror Elizabeth G., were as follows: 'In terms of [Elizabeth G.], the People dismissed [Elizabeth G.] because she was [a] customer service representative. In terms of that, we felt that she did not have enough education experience. It seems like she was not paying attention to the proceedings and the People felt that she was not involved in the process. The People felt she would not be a good juror.'

The trial court responded, "And I accept those reasons as being not based upon race or ethnicity. And I don't find that there has been a violation of *Wheeler* and that the - there was not systematic exclusion of a recognized ethnic group, i.e., Hispanics in this case. So the motion is denied."

Counsel for defendant Julian Reynoso asked if he could make a couple of points for the record, and the court permitted him to do so. The following colloquy then took place:

"[Counsel for Julian]: And a couple of points for the record is that counsel for the People passed on [Elizabeth G.] about seven or eight times. Then when I think he sensed that the defense was getting ready to pass, then it [*sic*: he] excused [Elizabeth G.] There's nothing about what [Elizabeth G.] said in terms of her background that would make her be sympathetic to the defendants in this case. When she said she was a customer service rep. Her husband is a construction supervisor. [¶] She's got friends in the Porterville [Police Department], her brother or brother-in-law works for the California Department of Corrections. There was nothing in her responses or her demeanor that would justify just excusing her other than it being a race-based exclusion is our position."

"The Court: And I believe that there was another Hispanic that was excused not by the People, but by the defense, and that was [Carolyn G.]."

"[Counsel for Julian]: That was a legitimate reason. I didn't excuse her."

"The Court: I'm not saying it wasn't legitimate. You just brought up - I'm not arguing with you, but I want the record to be clear, you argued that even a

person who the People should want to have on, namely law enforcement background, may still kick off [*sic*: be kicked off] because of being Hispanic. I'm just pointing out that [Carolyn G.] was another person that is [of] Hispanic background but they did not kick [her] off and I believe her background was that she had been the one who had been kidnaped."

"[Counsel for Julian]: Right. I would say she would want to be kept on by the People because she's been a victim of a violent crime at gunpoint."

"The Court: But your agreement was that so should the other person[6] because they had law enforcement background."

"[Counsel for Julian]: I didn't say she was law enforcement background."

"The Court: I thought you said"

"[Counsel for Julian]: I was looking over my notes in terms of what she[7] said in answer to the nine questions that are up on the little poster. She responded that she had friends in the Porterville [Police Department]."

"The Court: Right. Law enforcement people."

"[Counsel for Julian]: And a brother who works for California Department of Corrections. So I'm just saying that based on those responses, there's no legitimate reason to exclude her based on those responses other than the fact that she has her - she's Hispanic. I'm trying to make that for the record. [¶] [The prosecutor] argued that [Mary L.] would be sympathetic because she works with at risk youth. That's his reasons for excusing her. But for the record also the reason [Carolyn G.] was excused as I understand it from [counsel for John Reynoso,] is because she was a victim of violent crime where guns were involved. That's what we have here."

"The Court: Okay. Thank you."

"[The Prosecutor]: I'd like the record to reflect that defense counsel also challenged to [Mrs. T.], [who] seemed and looked Hispanic to me and I think they exercised or kicked off her as well."

"The Court: All right. We'll see you tomorrow morning at 9:45."

(Lodged Doc. 10 at 3-9 (footnotes in original).)

DISCUSSION

A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

---

[6] "In context, it is clear that 'the other person' the court was not referring to was Elizabeth G., whom the People had excused with their final peremptory challenge."

[7] "Again, in context, it is clear counsel is here referring to Elizabeth G."

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C. Batson Challenge

Petitioners contend that their constitutional rights were violated by the prosecutor's actions in exercising two peremptory strikes to excuse two Hispanic jurors, one of which is at issue in the instant petition. More specifically, Petitioners contend that the California Supreme Court misapplied the third Batson step because (1) the trial court erred by immediately accepting the prosecutor's stated reasons without "critical assessment," and (2) the prosecutor's reasons were vague, implausible, or irrelevant to the case and unsupported by the record. (Petition, at 1, 5.)

1. State Court Proceedings

a. Trial Court

After the jury was selected, but before they were sworn, defense counsel made a motion under Wheeler, arguing that the prosecutor had systematically excluded Hispanics from the jury. The following exchange occurred:

> Of the only juror they excused initially when he got into the box was the one gentleman who knew me from the Visalia Racquet Club, and then after that the only two other jurors that were dismissed were Hispanics, [Elizabeth G] and [Mary L].
>
> I would take note of the fact that the jury as it's constituted now has twelve whites as the twelve jurors and three white alternates. I think it was a deliberate attempt by the prosecution to eliminate the two Hispanics that made it to the jury panel from the jury panel. The two defendants in this case are both Hispanic. I believe that that's a violation of Wheeler, your Honor.
>
> THE COURT: I don't think it's timely. It needs to be made at the time you believe it's occurring. Having said that, because it puts the Court in a very awkward position now that we've got all 15. But I'm going to - - I'm going to have - - because the People did only exercise apparently three challenges, three or four challenges and two of those were Hispanic, I'm going to ask that the People give their reasons why they excused those two.

MR. JACKSON: So your Honor, you are ruling there was a prima facie case?

THE COURT: Yes.

MR. JACKSON: Your Honor, I believe the People that I dismissed were ... [Mary L] and [Elizabeth G].

THE COURT: That's correct, four.

MR. JACKSON: Your Honor, you want the reason for the two Hispanic surnames or all four?

THE COURT: Just the Hispanic surname.

MR. JACKSON: Your Honor, the People dismissed [Mary L] based upon her being a counselor for at risk youth. The People feel that [Mary L] would have an undue sympathy for both defendants in this case because they are young and definitely if not at risk, past risk.

The People feel that she would associate with the people she works with and she would probably would have pity on them.

In terms of [Elizabeth G], the People dismissed [Elizabeth G] because she was customer service representative. In terms of that, we felt that she did not have enough educational experience. It seemed like she was not paying attention to the proceedings and the People felt that she was not involved in the process. The People felt she would not be a good juror.

THE COURT: And I accept those reasons as being not based upon race or ethnicity. And I don't' find that there has been a violation of Wheeler and that the - - there was not a systematic exclusion of a recognized ethnic group, i.e. Hispanics in this case. So the motion is denied.

[DEFENSE COUNSEL]: Can I make a couple points for the record?

THE COURT: You can.

[MR. TERRELL/DEFENSE COUNSEL]: Also for the record I'll join in the motion.

[MR. RUMERY/DEFENSE COUNSEL]: And a couple points for the record is that counsel for the People passed on [Elizabeth G] about seven or eight times. Then when I think he sensed that the defense was getting ready to pass, then it excused [Elizabeth G]. There's nothing about what [Elizabeth G] said in terms of her background that would make her be sympathetic to the defendants in this case. When she said she was a customer service rep. Her husband is a construction supervisor.

She's got friends in the Porterville PD, her brother or brother-in-law works for the California Department of Corrections. There was nothing in her responses or her demeanor that would justify just excusing her other than it being a race-based exclusion is our position.

THE COURT: And I believe that there was another Hispanic that was excused not by the People, but by the defense and that was . . . .

MR. RUMERY: That was a legitimate reason. I didn't excuse her.

THE COURT: I'm not saying it wasn't legitimate. You just brought up - - I'm not arguing with you, but I want the record to be clear, you argued that even a person who the People should want to have on, namely law enforcement background, may still kick off because of being Hispanic. I'm just pointing out that Mrs. . . . was another person that is Hispanic background but they did not kick off and I believe her background was that she had been the one who had been kidnapped.

MR. RUMERY: Right. I would say she would want to be kept on by the People because she's been a victim of a violent crime at gunpoint.

THE COURT: But your argument was that so should the other person because they had law enforcement background.

MR. RUMERY: I didn't say she was law enforcement background.

THE COURT: I though you said - -

MR. RUMERY: I was looking over my notes in terms of what she said in

> answer to the nine questions that are up on the little poster. She responded that she has friends in the Porterville PD.
>
> THE COURT: Right. Law enforcement people.
>
> MR. RUMERY: And a brother who works for California Department of Corrections. So I'm just saying that based on those responses, there's no legitimate reason to exclude her based on those responses other than the fact that she has her - - she's Hispanic. I'm trying to make that for the record.
>
> Counsel's argued that Miss Mary L... would be sympathetic because she works with at risk youth. That's his reason for excusing her. . . .

(RTA[8] 113-118.)

b. Court of Appeal

The state appellate court found that the trial court erred by failing to engage in a "sincere and reasoned attempt to evaluate the prosecutor's justification for challenging [Elizabeth G]. First, as previously discussed, the initial reason given by the prosecutor [Elizabeth G was a customer service representative with a lack of educational experience] was not supported by the record and lacked any content related to the case being tried. Second, the demeanor reason given by the prosecutor, which is not reflected with the cold record on appeal, was disputed by the defense yet not clarified in any way by the court. Finally, in rejecting defendant's argument, rather than focusing on the question of validity of the People's justifications, the trial court attempted to buttress its finding by analyzing a Hispanic juror not challenged by the People but excused by the defense." (Lodged Doc. 3, Opinion, at 21.)

c. California Supreme Court

In a published opinion, People v. Reynoso, 31 Cal.4th 903 (2003), cert. denied 125 S.Ct. 2929 (2005), the California Supreme Court reversed the Court of Appeal holding, in relevant part:

> We acknowledge that, when viewed objectively, the notion that *all persons* employed as customer service representatives would have insufficient "educational experience" to effectively serve on juries is of questionable persuasiveness. But the proper function of the reviewing court in a case such as this is not to objectively validate or invalidate such a broadly stated premise. The proper function on review in this case was to determine whether the trial court's conclusion— that the prosecutor's *subjective* race-neutral reasons for exercising the peremptory challenges at issue here were sincere, and that the defendants failed to sustain their burden of showing "from all the circumstances of the case"

---

8 "RTA" refers to Reporter's Redacted Transcript on Appeal, which is sealed with this Court. (Court Doc. 27.)

(*Wheeler*, *supra*, 22 Cal.3d at p. 280) a strong likelihood that the peremptory challenges in question were exercised on improper grounds of group bias—is supported by the record when considered under the applicable deferential standard of review.

Here, at a bare minimum, Elizabeth G.'s occupation as a customer service representative was confirmed by her answers to the general questions, as were the additional circumstances that she had no prior jury experience and no past contact with the criminal justice system in any capacity. If a prosecutor can lawfully peremptorily excuse a potential juror based on a hunch or suspicion, or because he does not like the potential juror's hairstyle, or because he observed the potential juror glare at him, or smile at the defendant or defense counsel, then surely he can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected.[9] As the Court of Appeal itself observed, this was a *murder* case, with two codefendants whose roles in the criminal episode were distinct. A prosecutor arguably could conclude in sincerity that a prospective juror employed in customer service, with no prior jury experience, no prior contact with the criminal justice system, and who further appeared to be inattentive and uninvolved in the jury selection process, would not be the best type of juror for the case. Such a determination might further be supported by a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from the cold transcribed record on appeal.

The trial court was obligated to evaluate "all the circumstances of the case" in the step three evaluation of whether the prosecutor's race-neutral reasons for peremptorily excusing Hispanic jurors Mary L. and Elizabeth G. were sincere and credible, or whether the defendants instead had sustained their burden of proving unlawful discriminatory intent in the exercise of the peremptory challenges. (*Wheeler*, *supra*, 22 Cal.3d at p. 280.) With regard to the first reason given in justification of the peremptory challenge of Elizabeth G., the question for the trial court was *not* whether, objectively speaking, *all customer service representatives* lack sufficient "educational experience" to sit on a jury (a dubious notion when viewed in isolation) or even whether, subjectively speaking, Elizabeth G., who was employed as a customer service representative, herself had insufficient "educational experience" to sit on the jury. The question for the trial court was this: was the reason given for the peremptory challenge a "legitimate reason," legitimate in the sense that it would not deny defendants equal protection of law (see *Purkett*, *supra*, 514 U.S. at p. 769), or was it a disingenuous reason for a peremptory challenge that was in actuality exercised solely on grounds of group bias?

The prosecutor also gave as his second, demeanor-based reason for excusing Elizabeth G., that it appeared to him she was not paying attention to the proceedings, and that he felt she was not sufficiently involved in the jury selection process to make a good juror. Here again, at a bare minimum, the record of Elizabeth G.'s answers to the questions posed to all the prospective jurors reflects that she had no prior jury experience and no prior contact with the criminal justice system in any capacity. Unlike the reasons given by the prosecutor in *Silva*, the prosecutor's reasons given in this case for peremptorily excusing Elizabeth G. were neither inherently implausible, nor affirmatively contradicted by anything in

[9] Indeed, an attorney could peremptorily excuse a potential juror because he or she feels the potential juror's occupation reflects *too much education*, and that a juror with that particularly high a level of education would likely be specifically biased against their witnesses, or their client's position in the case. As long as such a peremptory challenge was nondiscriminatory and "legitimate" in the sense that it does not deny equal protection of the law (Purkett, supra, 514 U.S. at p. 769), it would be lawful and valid.

the record.

The Court of Appeal focused, in particular, on this second, demeanor-based justification given for the excusal of Elizabeth G., and found it significant that the trial court made no attempt to clarify or probe the prosecutor's reasons for finding Elizabeth G.'s demeanor while in the jury box unsuited to jury service. But the trial court did expressly accept the prosecutor's race-neutral reasons for the peremptory challenge to Elizabeth G., finding them sincere and genuine. Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing Elizabeth G., including the demeanor-based reason, were sincere and genuine, is entitled to "great deference" on appeal. (*Batson, supra*, 476 U.S. at p.98, fn. 21; *Johnson, supra*, 47 Cal.3d at p. 1221.) Nor have we found anything in the record to directly contradict the trial court's express findings to that effect, in contrast to the facts of *Silva*. To the contrary, the prosecutor passed and accepted the jury 14 *times* with Elizabeth G. seated in the jury box (on four of those occasions, a second Hispanic prospective juror, Carolyn G., was also seated on the jury when the prosecutor passed and accepted it). Although not a conclusive factor, "the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a Wheeler objection . . . ." (*People v. Snow* (1987) 44 Cal.3d 216, 225.) If the prosecutor's occupation-and demeanor-based reasons for excusing Elizabeth G. were indeed pretextual, and he was in actuality bent on removing her from the jury because of her Hispanic ancestry,[footnote omitted] his acceptance of the jury *14 times* with Elizabeth G. seated in the jury box, on four such occasions with a second Hispanic prospective juror also seated on the jury, was hardly the most failsafe or effective way to effectuate that unconstitutional discriminatory intent.

..........................................................................................................................

Where, as here, the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible (*Silva, supra*, 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge.

Having considered all the circumstances of this case (*Wheeler, supra*, 22 Cal.3d at p. 280), we find nothing in the record to contradict the trial court's determination that no *Wheeler* error occurred, nor any reason to deviate from the customary "great deference" normally afforded such rulings. (*Batson, supra*, 476 U.S. at p.98, fn. 21.)

(Lodged Doc. 10, Opinion, at 25-33, footnote in original.)

2. Analysis of Claim

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in

Batson v. Kentucky, 476 U.S. 79, 89 (1986). In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995). First, the defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id.

If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859 (1991). Finally, the trial court must determine if the defendant has proven purposeful discrimination. Id. at 359. The Supreme Court has made clear that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from the opponent of the strike." Purkett v. Elem, 514 U.S. 765, 768 (1995); Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 974 (2006).

"When there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993). The court must consider the record as a whole and each explanation in order to determine whether an invidious discriminatory purpose may be inferred from the totality of the relevant facts of the case. Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (citing Hernandez, 500 U.S. at 363.)

There is no dispute that the only issue in this case is the trial court's analysis under step three of the Batson challenge. Here, as previously stated, the trial court found that Petitioner made a prima facie case of improper discrimination, and asked the prosecutor to explain his peremptory challenges as to two Hispanic jurors. In response, the prosecutor stated he excused Elizabeth G, the only juror at issue here, because of her lack of education and because it seemed

like she was not paying attention to the proceedings. The trial court accepted those reasons as not based on race or ethnicity and "there was not a systematic exclusion of a recognized group, i.e. Hispanics." (RTA 115.) As previously stated, Petitioners were ultimately tried and convicted by an all-White jury.

a. AEDPA Factual Finding Review

As an initial matter, there is a dispute over which state court's factual finding should be reviewed under AEDPA. Respondents argue this Court's review should be limited to the trial court's factual finding because this was the only court that engaged in any factfinding. Petitioners argue that both the trial court and supreme court decisions must be reviewed because the reviewing court adopted the trial court's factual findings. Petitioners are correct.

This Court can only grant relief under § 2254, if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The factual findings made by the state court are presumed correct unless the petitioner presents clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1). Long standing precedent establishes that the last reasoned decision of the state court, here California Supreme Court opinion, is reviewed. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). However, where as here, the state court adopted the factual findings of the trial court, the trial court's ruling must also necessarily be considered. See Lewis v. Lewis, 321 F.3d 824, 829 ("In this case, the appellate court's decision is the last reasoned decision, and is thus the decision we must review. Because that decision affirmed the trial court and adopted one of the reasons cited by the trial court, however, our analysis will necessarily include discussion of the trial court's decision as well.") (footnote omitted.); see also Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007 (en banc). "On habeas review, state appellate court findings-including those that interpret unclear or ambiguous trial court rulings-are entitled to the same presumption of correctness that we afford trial court findings." See Palmer v. Estelle, 985 F.2d 456, 459 (9th Cir. 1993).

b. Batson Claim

Petitioners contend that "the trial judge unreasonably applied Batson because he failed to make any findings at all, much less detailed ones, and to undertake any step-three analysis, much less a meaningful one." (Court Doc. 42; Supp. Briefing, at 18.)

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (citing Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In order for the state court decision to be an "unreasonable application" it must be "more than incorrect or erroneous." Id. The state court decision must be an "objectively unreasonable" application of the law. Id. As recently stated in Rice v. Collins, "a federal habeas court can only grant [the] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." 546 U.S. 333; 126 S.Ct. at 974. This Court looks to the "last reasoned decision" in applying these standards, here, the opinion of the California Supreme Court.

As set forth by Petitioners, in Kesser v. Cambra, 465 F.3d 351 (9th Cir. 2006),[10] the Ninth Circuit discussed at length the requirements of the court in analyzing a step-three Batson challenge:

> At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768. Although the burden remains with the defendant to show purposeful discrimination, the third step of *Batson* primarily involves the trier of fact. After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." *Miller-El*, 125 S.Ct. at 2332. "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.* "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective

[10] Ninth Circuit authority is binding on the United States District Court in the Eastern District of California. See Hart v. Massanari, 266 F.3d 1155, 1172 (9th Cir. 2001) ("an opinion of our circuit is binding within our circuit").

indicia of discrimination...." *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994).

> The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "A Batson challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El*, 125 S.Ct. at 2332. Reasons must be "related to the particular case to be tried." *Batson*, 476 U.S. at 98. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.
>
> The Court need not accept any proffered rationale. We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson*, 3 F.3d at 1331. The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" *Hernandez*, 500 U.S. at 363 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 576 (1976)); *see also Miller-El*, 125 S.Ct. at 2324 (noting that *Batson* requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting *Batson*, 476 U.S. at 94)); *Batson*, 476 U.S. at 93 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (internal quotation marks omitted)). A court need not find all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003); *see also United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

Kessler, 465 F.3d at 359-360.

At the third Batson step, the trial court must determine whether there has been intentional discrimination. Hernandez, 500 U.S. at 359. "The decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Id. at 365. "The trial court must not simply accept the proffered reasons at face value; it has a duty to 'evaluate meaningfully the persuasiveness of the prosecutor's [race]-neutral explanation[]' to discern whether it is a mere pretext for discrimination." Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004) (citing United States v. Alanis, 335 F.3d 965, 969 (9th Cir. 2003).). "Thus, the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of

counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing Lewis v. Lewis, 321 F.3d at 831.)

Here, the trial court recognized its duty under Step-three to make a determination as to whether purposeful discrimination had been shown, and the trial court made the specific factual finding that the reasons stated by the prosecution were not based upon race or ethnicity, and there was no violation of Wheeler because there was not a systematic exclusion of a recognized ethnic group, i.e. Hispanics. (RTA 115.)

The California Supreme Court failed to engage in comparative juror analysis at the time of Petitioner's appeal because California caselaw prohibited courts from applying comparative juror analysis. See People v. Johnson, 47 Cal.3d 1194, 1220-23 (1986); People v. Turner, 8 Cal.4th 137, 169 (1994). However, subsequent federal decisions are to the contrary. For the following reasons, under current Circuit authority, this Court must conclude that the state courts' failure to conduct such analysis was contrary to clearly established federal law.

The California Supreme Court's decision was issued prior to the United States Supreme Court's decision in Miller-El v. Dretke, 545 U.S. 231, issued June 13, 2005. There, the defendant was tried for capital murder. The prosecution exercised peremptory strikes against ten out of eleven prospective African-American jurors. Id. at 233. Over defendant's objection that the strikes were improperly based on race, the trial court denied the motion and he was sentenced to death for murder.[11]

In addressing the merits of the petition, the Supreme Court found that the prosecution had engaged in racial discrimination by using the peremptory challenges to excuse ten out of the

[11] The case has a rather lengthy procedural history. While the direct appeal was pending before the state appellate court, the United States Supreme Court decided Batson, which resulted in the case being remanded to the Texas trial court for application of the law as established in Batson, i.e. whether defendant could prove that the jurors were struck based on race. The trial court denied relief finding that the prosecution's reasons were race-neutral.

Defendant then sought habeas corpus relief in the federal district court, which was denied, and the Fifth Circuit Court of Appeals denied a request for a certificate of appealability. The Supreme Court reversed the Fifth Circuit's denial of a certificate of appealability, and remanded the case back for review on the merits. 537 U.S. 322, 348 (2003).

The Fifth Circuit Court of Appeals denied the petition on the merits, and the Supreme Court granted certiorari and issued the most recent decision on June 13, 2005. 545 U.S. 231.

eleven African-American jurors. In making its finding, the Court utilized comparative juror analysis, despite the fact that the state appellate courts had not done so, to determine whether the use of the strikes were motivated by race. Id. at 239-262. In Kesser, the Ninth Circuit applied comparative analysis for the first time on appeal stating that the California Court of Appeal failed "to consider comparative evidence in the record before it [which] undeniably contradicted the prosecutor's purported motivations, [and] unreasonably accepted his nonracial motives as genuine." 465 F.3d at 357. In applying comparative analysis, the Ninth Circuit held that "comparative analysis is required even when it is not requested or attempted in state court." Id. at 361. It went on to state that

> The [Supreme] Court in *Miller-El* applied comparative juror analysis to a case originally tried in 1986, remanded for a Batson hearing in 1988, and appealed under AEDPA in 2000. The Court's holding means that the principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992, before Kesser's 1993 trial.

Id. at 360.

Although the state court did not engage in comparative analysis, which was contrary to now clearly established federal law, the failure to do so does not in and of itself warrant relief in the action. Rather, the United States Supreme Court has recently confirmed that "when a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law," this Court "must then resolve the claim without the deference that AEDPA otherwise requires." Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858 (June 28, 2007). Thus, this Court simply reviews the claim *de novo* to determine whether Petitioner has established purposeful discrimination at step three of Batson.[12] See id. Although the California Supreme Court did not engage in comparative analysis at the time of Petitioner's appeal, this Court is

[12] Because the Court is reviewing the claim de novo, the Court need not and does not consider Petitioner's claim that the trial court applied the wrong legal standard in evaluating the prosecution's proffered justification, as such contention is moot in light of this Court's de novo review and application of clearly-established Supreme Court precedent.

presently bound by Ninth Circuit authority to conduct such an analysis.[13,14,15]

The prosecution's reasons were race-neutral on their face, and the trial court made the factual finding that no purposeful discrimination had been shown. The first reason the prosecutor gave for striking Elizabeth G was her lack of education. RTA 115. The second reason the prosecutor stated for striking Elizabeth G was that she "seemed" to be inattentive and was "not involved in the process." RTA 115.

Applying the comparative analysis as done in Kesser, Brian O, who served on the jury, was a shift supervisor for a canning plant and, like Mrs. Guerrero, had never served on a jury before, never been involved in a criminal case or with law enforcement, and never been a victim. RTA 72. Tracy D, who served on the jury, was a full-time mother and housewife. She had previously served on one jury, and had never been involved in a criminal case or in law enforcement. RTA 74. Jimmy C, served on the jury and worked for a "dairy products processing plant." He had never been on a jury, nor involved in a criminal case or in law enforcement. RTA 76. John G, served on the jury and worked as "[f]ield man for a packing house." He had never served on a jury, nor been involved in a criminal case, charged with a crime, or involved in law enforcement. RTA 107-108. Kenny D, served on the jury and stated his occupation was "Farming." He had not been involved in a criminal case and, other than being a victim of a theft, had no involvement with law enforcement. RTA 108.

Elizabeth G. had been a customer service representative for eight and one-half years with

---

[13] Ninth Circuit authority is binding on the United States District Court in the Eastern District of California. See Hart v. Massanari, 266 F.3d 1155, 1172 (9th Cir. 2001) ("an opinion of our circuit is binding within our circuit.")

[14] In their initial answer, Respondents argued that this Court was barred from applying the Supreme Court's analysis in Miller-El, under Teague v. Lane, 489 U.S. 288 (1986). However, in their supplemental brief, Respondents concede that "Miller-El set[s] forth the proper form of analysis for a federal court reviewing a state prisoner's claim that he proved at trial a prosecutor was racially motivated in when [sic] exercising prospective jurors. The question to be determined is one of pure fact . . . ." (Court Doc. 37; Supp. Briefing, at 2.)

[15] Any argument by Respondents that the comparative analysis was not raised to the state courts is unfounded. In reviewing the brief submitted to the Court of Appeal, Petitioner, Julian Jesus Reynoso, raised the argument that other white jurors remained on the jury panel despite their alleged lack of education. (Lodged Doc. 1, at 26-28.) Again, to the California Supreme Court, Petitioner raised the same argument. (Lodged Doc. 7, at 32.) A copy of the voir transcript was obviously available to the California Supreme Court.

the same company, which supports the prosecutions belief that she was lacking in education. Although some of the jurors occupations may have arguably suggested to the prosecutor and the trial court that they too were lacking in education which may undermine the prosecution's reason, none of them would necessarily present an impression particularly similar to that which might be made when a prosecutor observes that a person (Elizabeth G) is a customer service representative after eight and one-half years with the same company. More importantly, as discussed *infra*, this was not the sole reason given by the prosecution for excuse her.

In looking at the totality of the evidence, the prosecutor accepted Elizabeth G. many times prior to her excusal, despite the fact of her apparent lack of education. As Respondents submit, this strongly suggests that the prosecutor only found her lack of education of concern when combined with the further observation that she was inattentive during the jury selection process. The Court agrees with Respondents' argument the trial judge could have reasonably inferred that the prosecutor may not have been solely concerned with the lack of education alone, until it was coupled with Elizabeth G's observed inattentiveness prompting her excusal. This is substantiated by the fact that the prosecutor did not state the lack of education would have been sufficient standing alone.

Furthermore, the factual circumstances of the present case are much less drastic than those present in Miller-El and Kesser. Unlike here, in Miller-El, there was evidence of jury shuffling and disparate questions regarding the ethnicity of the prospective juror. Miller-El, at 253-263. Further, unlike in Miller-El, there is no evidence of a known practice of the Office of the Tulare County District Attorney, much less at the time of Petitioner's trial, that Hispanic jurors are not to be seated on juries. Miller-El, 545 U.S. at 253-254.

In this case, unlike in Kesser, a review of the prosecutor's justifications were not tainted with racial demonstration. In Kesser, the prosecutor struck three prospective Native American jurors, describing one of them as "darker skinned," stating that Native Americans who worked for the tribe were "'a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system.'" 465 F.3d at 357. The prosecutor expressed his concern about Native Americans resistence to the criminal justice system and belief that they

escape the criminal justice system may be more tolerant of child molestation because of their affiliation with the tribe. Id. In addition, the prosecutor struck the one remaining minority member of unknown heritage whom he described as "'brown skinned.'" Id.

To the contrary, in the instant case, no such evidence exists. Although applying comparative analysis in the instant case may arguably reveal a slight weakness in the prosecution's use of its peremptory challenges, a review of the totality of the circumstances surrounding the prosecution's use of the peremptory strike of Elizabeth G., simply does not rise to the level of demonstrating purposeful discrimination based on racial bias or pretext. The prosecution's justifications were clearly stated and were race-neutral. On this record, Petitioners simply have not shown purposeful discrimination under step three of Batson, and the petition should be denied.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondents.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: October 22, 2007** **/s/ Dennis L. Beck**

UNITED STATES MAGISTRATE JUDGE